**D. A. TOMPKINS CO. v. MONTICELLO COTTON OIL CO. et al.**

(Circuit Court, S. D. Georgia, W. D.    April 21, 1905.)

**1. STATUTORY LIENS—CONTRACTS—PERFORMANCE—TIME.**

A contract for the construction and setting of mill machinery provided that the seller's work should be considered completed when the mill was set in motion and each machine put on its legitimate work, at which time complete settlement should be made for unpaid balances; that the plant would not be delivered to the purchasers until such settlement was completed; and that the mill should be completed, ready for operation, on a specified date. *Held*, that the time fixed for the completion of the contract was of its essence, and, on the seller's failure to complete the same until long after the time specified, it was not entitled to a statutory lien under Code Ga. 1895, §§ 2801, 2804, giving to contractors for building factories, and furnishers of material and machinery therefor, etc., a special lien on the real estate, "provided the contractors have made a substantial compliance with their contract."

**2. SAME—CONTRACTS—CONDITIONAL SALE—EQUITABLE MORTGAGE.**

A contract for the purchase of machinery and mill equipment provided that the title to the machinery and equipment should remain in the seller until payment of the price; that failure to execute notes and deliver the same as provided in the contract, or to pay any of the amount specified at maturity, should entitle the seller to take possession of the machinery and other property named, and sell it by private or public sale after 30 days' advertisement, without process of law, and retain any balance unpaid, together with interest, traveling expenses, and attorney's and other fees connected with collection, and pay the buyers any surplus, and collect from them any deficiency. *Held*, that such contract was not a conditional sale, but, at most, an equitable mortgage.

**3. SAME—ENFORCEMENT.**

Where a contract to purchase mill equipment and machinery constituted a mere equitable mortgage thereon to secure the price, and it appeared that the purchasers were solvent, and that the seller had made default in complying with its contract within the time specified, and that the buyers had suffered considerable damage thereby, such mortgage would not be enforced in equity, except to the extent of the amount due on the contract after deducting the buyers' damages.

**4. SAME—ATTORNEY'S FEES—EXPENSES.**

Where an equitable mortgage on mill machinery and equipment provided that in case of enforcement the seller should be entitled to retain from the proceeds of a sale of the machinery any balance of the price unpaid, together with interest, traveling expenses, and attorney's and other fees connected with collection, but the buyers had a meritorious defense to a part of the amount claimed, no allowance would be made for attorney's or other fees connected with the collection.

In Equity.

Robert C. Alston and Merrel P. Callaway, for complainant.

John R. L. Smith and Greene F. Johnson, for respondents.

SPEER, District Judge. This cause is under consideration for final decree. All of the evidence has been taken and submitted to the court. The contentions of the parties have been fully argued, and the court has taken time for consideration.

The case is a bill brought in equity to enforce the recovery of the price of certain machinery and equipment used in the manufacture of oil from cotton seed. The cost of the machinery, equipment,

and installation was $19,000. The complainant is a manufacturer and dealer in such machinery, and a contractor for its installation. The defendants were the projectors, and subsequently became the incorporators, of the Monticello Cotton Oil Company. While these persons, as the contract was made with them, were made parties, the principal defendant is the oil company. It appears from the evidence that the machinery was manufactured or furnished by the complainant, and installed in the mill of the defendant company. A dispute arising between the parties, and it being denied by the defendants that there was a substantial compliance on the part of the complainant with its contract to furnish and install the machinery within the time limited, payment of the full amount claimed was denied. The bill was then brought. As originally presented, this had a double aspect. It was alleged that complainant was entitled to a materialman's or contractor's lien, as defined by the law of Georgia. A suitable prayer was made for the enforcement of such lien. It was also alleged that the contract between the parties was a conditional sale, and, since the condition of payment had not been complied with, the bill also presented a prayer for an order directing the recaption or restitution to the complainant of the machinery and equipment sold, delivered, and installed. However the averments and the prayer with relation to this construction of the contract are not merely for recaption. It is alleged that since the machinery has been installed and attached to the realty, or otherwise built into the plant, it is impossible to retake it in its entirety without great loss, and the court is asked to frame such a decree as will enforce the equitable rights of the vendor. While the bill rested in the form thus described, a demurrer was interposed thereto. The principal ground of this was that the court was without equitable jurisdiction. It appearing, however, to the court that the bill, by its averments, made obviously a case for the enforcement of a statutory lien authorized by state law, this demurrer was overruled. Answer and replication having been filed, and the evidence taken, the case was assigned for hearing. On the hearing the complainant amended its bill; alleging, in substance, that the contract relied on must be treated as a chattel mortgage, and accompanied this amendment with a prayer seeking to enforce it as such. This amendment, having been allowed, reopened the case to the usual defenses. An additional demurrer was interposed upon the ground that the contract was in no sense a mortgage, and otherwise objecting to the amended bill for the want of equity, etc. This demurrer, while argued, is, by consent of counsel, to be considered and determined in connection with the whole case.

The questions involved have not been free from difficulty. The contract is set out in a printed and written order. The blank order was furnished by the Tompkins Company, as is usual with them in such transaction. It was completed and signed by the defendant company, or, more accurately, by the projectors, who were afterwards the incorporators. Of the responsibility of these parties, in case liability is established, there is no question. The order is in evidence, and its material stipulation will be presently considered.

Its acceptance by the complainant, along with certain "general conditions," constitutes the contract. These general conditions accompanying the order are also in print and in writing, and, it is conceded, were agreed to by the complainant. They contain the following material stipulations:

"Our work is to be considered completed when the mill is set in motion, and each machine is put on its legitimate work. At this time complete settlement must be made for unpaid balances in cash or by notes, as per order sheet.

"The plant will not be delivered over to purchasers until this settlement is completed as above.

"We guarantee all machinery and equipment to be first-class -in material and workmanship, and to work well for the purposes intended, if properly used.

"In case of original defect in any machine or part of machine, we agree to make good the defect by supplying a new machine or new part."

These are the printed covenants. Another, in writing, and that upon which the controversy practically depends, was added. It is this:

"Mill to be completed ready for operation on Sept. 15th, 1902."

The contract thus created by the order, the general conditions, and the acceptance will be found to contain no specification creating in behalf of the complainant the statutory lien relied upon. The law of Georgia authorizing or creating such a lien is found in section 2801 of the Code of 1895. This provides:

"All contractors for building factories, furnishing material for the same, or furnishing machinery for the same; and all machinists and manufacturers of machinery, including corporations engaged in such business, who may furnish or put up in any county of this state any steam mill or other machinery, or who may repair the same; and all contractors to build railroads, shall each have a special lien on such real estate, factories or railroads."

Section 2804 provides:

"To make good the liens specified in section 2801, they must be created and declared in accordance with the following provisions, and on failure of either the lien shall cease, viz.: (1) A substantial compliance by the party claiming the lien with his contract for building, repairing, or improving, or for materials or machinery put up or furnished, as set forth in said section. (2) The recording of his claim of lien within three months after the completion of the work, or within three months after such material or machinery is furnished."

Now it is insisted for the defendants that there was no such substantial compliance with its contract by the complainant as would make good this lien. This contention, in our opinion, is supported by the evidence. It is plain that time was of the essence of this contract. As we have seen, it was expressly contracted in writing that the mill should be completed on the 15th day of September, but this was not done. The machinery was installed imperfectly not until the 6th of November, and even then was operated by the skilled workmen of the complainants until the 8th of December, when the machinery was so sufficiently adjusted that it might be turned over to the defendants. Now the written covenant as to the date of completion was made with a definite purpose. This was to enable the parties who were investing their means in the oilmill to utilize the cotton seed of the current crop year. It indeed ap-

pears from the evidence that there were on the ground a number of competitors of the Tompkins Company, all engaged in the manufacture of such machinery and in the construction of such mills, who competed strenuously for this contract. It also appears that the contract was given by the defendant company to the Tompkins Company because the latter undertook to have the mill completed at the time explicitly named in the written addition above mentioned, as the other bidders could not do. That the complainants failed to comply with this condition is indisputable. That such failure negatived such a substantial compliance as would make the lien good is equally plain. Much is said in the argument and in the briefs of counsel with regard to the amount of damages resulting to the defendant company. It is perhaps not material, in deciding whether or not the lien is good, that the court should make a definitive finding as to damages. It is perhaps sufficient to declare that appreciable damages resulted. The proof is abundant to demonstrate that, relying upon the promise of the complainant as to the date of completion, there were preliminary purchases and storage of large quantities of cotton seed. This resulted in injury and considerable loss. There were other alleged deficiencies in performance, for which damages are claimed, and in view of which it is insisted that there was no substantial compliance with the contract. When the mill was finally completed and tendered, these questions were raised, and the defendants refused to accept the mill until it was agreed in writing that they might do so without prejudice to their claim for injury and damage resulting from the delay. The court has felt obliged, therefore, to consider all the evidence showing want of substantial compliance and the resulting damage, and, when this is precisely ascertained, to direct that the sum thereof shall be subtracted from the total amount which the complainants claim. To determine the lien claimed to be good, it would be incumbent upon the court to hold that the defendants did not suffer any substantial damage because of the complainant's delay. This, in view of the evidence, would be quite unjustifiable. The effort on the part of the complainant to justify its delay by the anthracite coal strike in Pennsylvania does not seem meritorious. There is perhaps a remote possibility that this conflict between capital and labor may have had some effect on this, as upon any similar contract, but the connection is too remote to be judicially appreciable. For these reasons, we hold that the proof does not establish the lien of a manufacturer and contractor, and must deny the prayer to enforce such lien.

The prayer that the contract shall be treated as a conditional sale, in view of all the evidence, must also be denied. It is plain enough that there is on the face of the order an apparent attempt of reservation of title by the complainant. In all such cases, however, the court must look at the entire transaction, and ascertain what was the true intent of the parties. As stated in the very recent work of Isaac on Conditional Sales, par. 13:

"It sometimes becomes difficult to determine whether a particular transaction constitutes a mortgage or a conditional sale. In such cases the question

must be determined by a consideration of the circumstances of the case and the intention of the parties." Citing 1 Jones on Mortgages, § 258.

The learned author continues:

"In doubtful cases the courts are inclined to construe the transaction as a mortgage, rather than a conditional contract of sale, for the reason that an error which converts a conditional contract of sale into a mortgage is less harmful than one which converts a mortgage into a conditional sale. Pioneer Gold Mining Co. v. Baker (C. C.) 23 Fed. 258; Dunbar v. Rawles, 92 Am. Dec. 311."

This view finds strong support in the case of Herryford v. Davis, 102 U. S. 246, 26 L. Ed. 160. There the question was whether the contract constituted a mortgage or conditional sale. "What, then," said Mr. Justice Strong, for the court, "is the true construction of the contract? The answer to this question is not to be found in any name which the parties may have given to the instrument, and not alone in any particular provision it contains, disconnected from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account." After reciting the provisions of the contract, the learned justice continues:

"In view of these provisions, we can come to no other conclusion than that it was the intention of the parties, manifested by the agreement, the ownership of the cars should pass at once to the railroad company, in consideration of their becoming debtors for the price. Notwithstanding the efforts to cover up the real nature of the contract, its substance was an hypothecation of the cars to secure a debt due to the vendors for the price of a sale. The railroad company was not accorded an option to buy or not. They were bound to pay the price, either by paying their notes, or surrendering the property to be sold in order to make payment. This was in no sense a conditional sale. This giving the property as a security for the payment of a debt is the very essence of a mortgage, which has no existence in a case of conditional sale."

When we look at the intention of the parties in the case before the court, it is apparent that, notwithstanding the verbal reservation of title in the order, neither anticipated that the reservation should be made effective as such. If, however, the contract be held to constitute originally a conditional sale, with the express right of recaption in the vendor, the court would not now, under all the circumstances of this case, permit the destruction of the mill of the defendant company, when there is no good reason why this should be done. The company and the incorporators who signed the contract are wholly solvent. There is no averment or pretense to the contrary. The complainant will have no difficulty in enforcing any recovery we may decree. The amount justly due is in fair dispute. It would be unconscionable, therefore, to grant to the complainant an order which would justify a demolition and destruction of the defendants' solvent and presumably profitable enterprise. It is the duty of a court of equity, under such circumstances, to secure the rights of the complainant with as little injury as possible to the defendants. This, as it will presently appear, may be accomplished by treating the contract upon which the complainant relies not as a lien or a conditional sale, but as an equitable mortgage, not only upon the machinery sold and furnished, but upon the real estate

to which it has been attached—a mortgage given to secure the amount which may be ascertained as rightly due the complainant. In the ascertainment of this, it is equally the duty of the court to subtract from the claim the sum of the actual damages which the defendants have sustained because of any distinct and substantial breach of contract for which the complainant may be properly liable.

Our conclusion that this contract creates, under all the circumstances, an equitable mortgage, depends upon the following material clauses of the order for the machinery:

"It is understood and agreed that the title to the machinery and equipment named shall remain with and be vested in you until the payment in legal currency of all the above amounts.

"Failure to execute notes and deliver same to you, as provided, or to pay any of the above amounts at maturity, shall entitle you to take possession of the machinery and other property named, and sell it by private or public sale, after thirty days' advertising, and without process of law, and retain and balance that may be unpaid on all notes, together with interest, traveling expenses, attorney's and other fees, connected with collection, and pay us any surplus and collect from us any deficiency."

Here, as stated, the title is apparently reserved. This is done, however, not for the purpose of giving the complainant absolute control over the machinery and equipment in case default in payment shall be made, but merely to secure the amount of its claim. It is true that complainant, on such default, is entitled to take possession of the machinery and other property named. There is, however, no independent and absolute right to hold or dispose of such property. On the contrary, the complainant is expressly obliged to sell it at private or public sale after 30 days' advertising. It is also authorized to retain any balance that may be due on all notes, together with interest, traveling expenses, attorney's fees, and other fees connected with collection. This imports, of course, any balance which may remain after the proceeds of such sale are credited upon the notes. Even more significant is the stipulation that the complainant is obliged to "pay us" (the defendants) any surplus. This is also characteristic of a mortgage rather than of a conditional sale. If, however, there is not enough of the proceeds of the machinery to pay the debt, by the same clause complainant is given the right to collect the deficiency from the defendants. All of these features are characteristic of a mortgage rather than a conditional sale. We conclude, as between the parties to the contract itself, the rights of no third person having intervened, that this is nothing more or less than an equitable mortgage. This view seems fully sustained by the Supreme Court in Chicago Railway Equipment Co. v. Merchants' Bank, 136 U. S. 268, 10 Sup. Ct. 999, 34 L. Ed. 349. There the instrument in question was a note. It contained this stipulation:

"On the failure of the maker to pay the principal and interest of any one of the notes of said series, and all of said notes are given for the purchase price of two hundred and fifty railway freight cars manufactured by the payee hereof and sold by said payee to the maker hereof, which cars are numbered from 13,000 to 13,249 inclusive, and marked on the side thereof with the words

and ʎetters, 'Blue Line, C. & E. I. R. Co.,' and it is agreed by the maker hereof that the title to said cars shall remain in the said payee until all the notes of said series, both principal and the interest are fully paid, all of said notes being equally and ratably secured on said cars."

It was held that the title was retained only by way of security for the payment of the notes, and the agreement for the retention for that purpose was a short form of a chattel mortgage. Said Mr. Justice Harlan, for the court:

"The transaction is, in legal effect, what it would have been if the maker, who purchased the cars, had given a mortgage back to the payee, securing the notes on the property until they were all fully paid."

This view would seem to meet and to provide for all the equities of the parties. It accords to the complainant a lien as good as another for the amount it is actually entitled to recover. It will afford equal opportunity to the defendants to have the amount claimed diminished by the justly ascertained damages which it has actually sustained for breach of contract. It will preserve the integrity of the cotton oil plant, for which the defendants have already paid the complainant $10,000, and subject it to no such destructive process as the removal of its machinery. Thus no unnecessary injury will result to either party. This construction will, on the one hand, avoid the harsh and drastic enforcement of the alleged lien—a remedy granted in derogation of common right—and, on the other, the great loss to the parties, after their extensive and costly preparation, which would result, should the court be obliged to sustain the motion to dismiss the bill for want of equity. The parties are here with full proofs. There is the proper diversity of citizenship. The jurisdictional amount is also involved. Finding the defense in part, at least, meritorious, the court feels obliged to disallow the claim for attorney's fees, traveling expenses, and other fees connected with collection. Nothing, then, remains to be done, save to ascertain by how much the complainant's demand shall be reduced because of the failure on its part to complete the contract by the time and in the manner it engaged to do. This task will be referred to a master, with direction to compute such damages, and to restrict his attention to the evidence upon which the court has passed. On hearing the report of the master, and such proceedings as may be appropriate thereto, the court will grant a decree to enforce the mortgage for the sum ascertained to be due the complainant, and will at the same time determine how the costs shall be apportioned.